# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| *IN RE:* | |
| *ALLIANCE LEASING CORP. ET. AL.* | *Case Number: 05-02397* |
| *Debtor* | *Chapter 11* |
| | *Hon. George C. Paine, II* |
| *MICHAEL E. COLLINS, TRUSTEE* | |
| *Plaintiff* | |
| *v.* | *Adversary Number: 07-0065A* |
| *IBM SOUTHEAST EMPLOYEES FEDERAL CREDIT UNION, SOUTHEAST SERVICES ORGANIZATION, INC.* | |
| *Defendants* | |

## MEMORANDUM

This matter is before the court on IBM Southeast Employees' Federal Credit Union's (hereinafter IBMSEFCU) and Southeast Services Organization, Inc.'s (hereinafter SSO) (hereinafter collectively "Defendants") Motion to Dismiss and/or for Abstention as to the adversary complaint filed by the Liquidating Chapter 11 Trustee (hereinafter "Trustee"). For the reasons cited herein, the court GRANTS IN PART AND DENIES IN PART the Motions to Dismiss, and GRANTS the Defendants' Motion for Abstention. The following constitutes the court's findings of fact and conclusions of law.

As to the factual background, the Trustee's Amended Complaint alleges in part

as follows:

## *FACTUAL BACKGROUND*

6. The Debtor commenced this bankruptcy case on February 28, 2005 (the "Petition Date") by filing a voluntary petition for relief in the United States Bankruptcy Court for the Middle District of Tennessee ("Court" or "Bankruptcy Court"), seeking protection under Chapter 11 of Title 11 of the United States Code ("Code" or "Bankruptcy Code").

7. The Trustee was appointed by Court Order entered March 9, 2005.

8. Prior to the Petition Date, the Debtor conducted an automobile leasing and brokerage business (operated pursuant to various dealers' licenses) which provided a mechanism for credit unions to provide their members with (i) automobile leasing services and (ii) a discount vehicle buying service.

9. The Debtor was incorporated in 1987 and, until approximately 1994, operated almost exclusively in Tennessee, Georgia and Alabama. The company was founded by Robert Michael Whitmore. On or about 1996, V. Gene Handy, who had been the primary operations manager for the company, was made a 49% owner of the company, with Mr. Whitmore holding the majority shares.

10. During the Summer of 1994, Mr. Handy was introduced to Barry Hughes, who was an officer of IBM Southeast Employees Federal Credit Union ("IBMSEFCU") and of Southeast Services Organization, Inc. ("SSO"), a credit union service organization ("CUSO") set up for IBMSEFCU. At that time, Mr. Handy was interested in entering Alliance's programs into the Florida market and Mr. Hughes was eager to create a new source of business for SSO and IBMSEFCU.

11. Alliance and SSO entered into the Service Agreement dated August 22, 1994 (the "Service Agreement"). Attached hereto as EXHIBIT A is a true and correct copy of the Service Agreement. Pursuant to the Service Agreement, SSO agreed to promote the Alliance Automotive Program to Florida credit unions. The Service Agreement further provided that SSO's responsibilities would include "contacting Affiliated Credit Unions and utilizing its best efforts to cause such credit unions to initiate and offer the Alliance Automotive Program to their members" and " providing general administrative services, when feasible, relative to the day-to-day operations of the Automotive Programs within Affiliated Credit Unions."

12. The Service Agreement provided that SSO would receive an acquisition fee of $200 for each lease and $100 for each vehicle sale initiated by Alliance through a Florida credit union. Additionally, SSO was to receive 30% of the mark-up on additional options added to in the vehicle purchase transactions and $125 for every fully-paid vehicle service contract sold by Alliance.

13. Following the execution of the Service Agreement, SSO and Alliance began marketing the Alliance Automotive Program to the Florida credit unions. Barry Hughes initiated the contact and negotiated the terms of the Alliance Automotive Program with each Florida credit union.

14. Each Florida credit union executed an Alliance Automotive Program Agreement ("AAPA"). Attached hereto as EXHIBIT B is a true and correct copy of the AAPA executed by IBMSEFCU. The AAPA set forth the rights and obligations of Alliance, SSO and the credit union under Alliance Automotive Program.

15. With respect to taxes, the AAPA provided as follows:

    Alliance will collect and remit all sales and use taxes, tag, title and registration fees, or other required taxes or fees customarily charged in connection with a lease or purchase transaction, to the proper city, county or state tax authority, when due out of the funds collected.

    a. All use tax monies (leases only) will be deposited by Alliance to the tax account of Southeast Services Organization, Inc., held at the IBM Southeast Employee's Federal Credit Union.

    b. It is the responsibility of Southeast Services Organization, Inc., to transfer the necessary funds each month to Alliance to remit all required use tax to the proper city, county or stats tax authority as due. . . .

16. Barry Hughes opened tax accounts at IBMSEFCU for each Florida credit union that executed an AAPA (collectively, the "Tax Accounts"). Barry Hughes and V. Gene Handy were listed as joint owners of each of the accounts. The interest on the funds in the Tax Accounts was to be paid to Alliance.

17. From 1994 to 2003, the sales and use taxes related to vehicles leased under the AAP were deposited in the Tax Accounts. During that period, SSO transferred funds on a monthly basis from the Tax Accounts to Alliance's operating account in order to fund the payment of taxes. In Florida and many other states, the use taxes on vehicle leases become due as each lease payment is made.

18. From 1994 to the Petition Date, SSO received monthly reports from the Florida credit unions regarding the current status of outstanding leases and the taxes owed on the leased vehicles.

19. On or before January 29, 2003, V. Gene Handy and/or R. Michael Whitmore requested SSO to transfer approximately $256,616.24 out of the Tax Accounts into Alliance's operating account. Barry Hughes was made aware that the requested transfer was not for the payment of sales and use taxes and approved the transaction. On January 29, 2003, SSO transferred approximately $256,616.24 from the Tax Accounts to Alliance's operating account unrelated to the payment of taxes owed.

20. In August 2003, Dade County Federal Credit Union ("Dade") notified Alliance that it was terminating the AAPA effective October 1, 2003. At that time, Dade did more business with Alliance than any other Florida credit union.

21. In August 2003, V. Gene Handy notified Barry Hughes regarding Dade's decision to terminate the Program and requested that Mr. Hughes attempt to convince Dade to reconsider. Mr. Handy further advised Mr. Hughes that, without Dade's business, Alliance would not likely be able to survive.

22. Still in August 2003, Mr. Hughes advised Mr. Handy that IBMSEFCU was terminating the leasing program with Alliance as of September 1, 2003.

23. Mr. Hughes did not advise any Florida credit union, other than IBMSEFCU, regarding Alliance's unstable financial situation at any time after being advised of the situation by Mr. Handy.

24. On or before February 23, 2004, V. Gene Handy and/or R. Michael Whitmore requested SSO to transfer approximately $263,244.37 out of the Tax Accounts into Alliance's operating account. Barry Hughes was made aware that the requested transfer was not for the payment of sales and use taxes and approved the transaction. On February 23, 2004, SSO transferred approximately $263,244.37 from the Tax Accounts to Alliance's operating account unrelated to the payment of taxes owed.

25. On March 15, 2004, SSO transferred approximately $29,719.27 from the Tax Accounts to Alliance's operating account unrelated to the payment of taxes owed. Barry Hughes was aware of the March 15, 2004 transaction and was aware that the transfer of funds from the Tax Accounts was not for the purpose of paying taxes.

26. As of the Petition Date, the Tax Accounts had a balance of approximately $9.76. The unliquidated use tax liability of Alliance on all outstanding leases related to Florida Credit Unions as of the Petition Date was approximately $387,049.40.

27. Since the inception of the Tax Accounts, IBMSEFCU has failed to pay any interest to Alliance. IBMSEFCU paid interest on the Tax Accounts to SSO.

28. As of the Petition Date, approximately $2.3 million was owed to automobile dealers and credit unions relating to vehicles that had been leased or sold pursuant to the AAPAs.

29. By Assignment dated May 22, 2007 Score Federal Credit Union assigned its claims against IBMSEFCU and SSO relating to the AAPA to the Trustee.

30. By Assignment dated May 29, 2007, Gulf States Credit Union, assigned its claims against IBMSEFCU and SSO relating to the AAPA to the Trustee.

As to the procedural history of the case, the facts are not in dispute. The debtor's chapter 11 bankruptcy petition was filed on February 28, 2005. Approximately one

week after the case was filed, Michael E. Collins was appointed Chapter 11 Trustee in the case. On August 21, 2006, the court confirmed the Trustee's Third Amended Plan of Liquidation. On February 28, 2007, the trustee filed the present adversary proceeding against Southeast Services Organization, Inc., and IBM Southeast Employees Federal Credit Union. Shortly thereafter, SSO and IBMSEFCU filed motions to dismiss the adversary proceeding and/or seeking abstention.

The defendants seek to dismiss the trustee's complaint based upon the confirmation order's res judicata effect and/or failure to state a claim for which relief can be granted. In addition, the defendants assert that this court should exercise mandatory or discretionary abstention with respect to the claims raised by the trustee's Amended Complaint.

The trustee's Amended Complaint raises the following counts:

Count I: A breach of Contract action against SSO for breach of the Service Contract, the AAPA, and for representations made to Alliance and the Florida Credit Unions causing damages of not less than $400,000.

Count II: A Negligence claim against IBMSEFCU for its alleged breach duty of care to Alliance by failing to inform of Alliance's impending financial difficulties after learning of Alliance's financial situation in August 2003. IBMSEFCU further breached its duty of care by terminating its own participation in the Alliance leasing program after learning of Alliance's financial difficulties, thereby increasing the relative exposure of the Florida credit unions to the impending financial collapse. Damages are alleged as not less than $500,000.

Count III: A Negligence claim against SSO based on SSO's alleged breach duty of care to Alliance and the Florida credit unions by failing to inform the same regarding Alliance's impending financial difficulties after learning of Alliance's financial situation in August 2003. SSO further breached its duty of care by failing to adequately monitor the withdrawals from the Tax Accounts. Damages are alleged in an amount not less than $500.000.

Count IV: Alleges that SSO and Alliance were joint venturers and as a joint venturer Alliance and SSO are jointly and severally liable to the Florida Credit Unions, credit union members and vehicle dealers who have claims under the Alliance Automotive Program. Because Alliance's assets have been liquidated, Alliance seeks contribution in an amount no less than

$2,300,000.

Count V: Seeks equitable subordination of SSO's claim pursuant to 11 U.S.C. § 510 for SSO's alleged inequitable conduct by advising IBMSEFCU of Alliance's impending financial problems but not providing that information to all of the Florida credit unions. Alliance seeks to subordinate any claim of SSO to all other claims in the case.

Count VI: Alleges that SSO, through Barry Hughes, made statements with intent to induce Alliance and the Florida Credit Unions into entering the AAPA, and that as a result of the misrepresentations, Alilance suffered damages not less than $1,500,000. Alliance also seeks punitive damages.

Count VII: Alleges Conversion by SSO of the interest payable on the Tax Accounts without Alliance's consent. This count alleges damages of no less than $100,000.

Count VIII: Alleges Breach of Contract by IBMSEFCU for failure to pay interest on the Tax Accounts and seeks damages of no less than $100,000.

Count IX: Seeks equitable subordination of IBMSEFCU's claim for the alleged inequitable conduct of allegedly benefitting from non-public information for the benefit of IBMSEFCU to the detriment of Alliance and the other credit unions. Alliance seeks to equitably subordinate any and all claims to all other creditors in the case pursuant to 11 U.S.C. § 510.

Count X: Alleging another breach of contract action against SSO for failing to comply with the AAPA's. Alternatively, SSO promised it would comply with the AAPA's and its' failure to do so harmed Alliance. Alliance for itself and as the assignee of certain Florida credit unions, seeks damages of no less than $2,300.000.

Based on these allegations, the trustee argues that res judicata has no effect as to his ability to pursue these claims. The trustee also contends that under the Federal Rules of Civil Procedure, these pleadings certainly can withstand a 12(b)(6) Motion to Dismiss. Finally, he argues that although all his claims are core, certainly the core claims of equitable subordination require that this court retain jurisdiction and decide these matters without abstaining.

### I. Motion To Dismiss

### A. Res Judicata & Motion to Dismiss

The defendants posit that the failure of the trustee to specifically reserve in the confirmed plan, the causes of action now asserted forever bars those actions under the doctrine of ***res judicata***. More specifically, the defendants contend that the Confirmed Plan and the Confirmation Order provided only a "blanket reservation" as to causes of action held by the trustee prior to confirmation. Defendants rely upon ***In re Pen Holdings, Inc.***, 316 B.R. 495 (Bankr. M.D. Tenn. 2004) and ***In re James River Coal Co.***, 355 B.R. 45 (Bankr. M.D. Tenn 2006) (holding categorical reservations may defeat a res judicata bar) and other cases such as ***In re American Preferred Prescription, Inc.***, 266 B.R. 273, 277 (E.D.N.Y. 2000) ("[t]he majority of courts that have examined this issue have held that . . . the plan must expressly reserve the right to pursue that particular claim post-confirmation and that a blanket reservation allowing for objection to any claim is insufficient."). The trustee is barred by ***res judicata***, according to the defendants because his reservation is to general and does not meet the categorical standard of ***Pen Holdings***.

The relevant terms of the confirmation order with respect to this adversary proceeding provide as follows:

> It is therefore . . .
>
> **ORDERED** that the assets vested in the Liquidation Trust shall include all assets of the Estate of any kind and nature whatsoever, including, but not limited to, any and all causes of action that could be brought by a trustee pursuant to chapter 5 of the Bankruptcy Code, or that were held by the Estate against any individual or entity arising out of or relating to the business operations of the Debtor; and it is further. . .
>
> ORDERED that the injunction set forth above and in IV.E.2 of the Plan shall not apply to any claims that may be asserted by the Plan Trustee relating to liability of any individual or entity arising from negligent or intentional mishandling, if any, of sales taxes collected from Customers and deposited or required to be deposited into Alliance tax escrow accounts;

***Order Confirming Trustee's Third Amended Plan of Liquidation***, Docket Number 352 (Aug. 21, 2006). In addition, the Disclosure Statement and Third Amended Plan of Liquidation contained the following provision, respectively:

> Upon confirmation of the Plan, the Trustee anticipates that additional litigation will be necessary. The pending adversary proceedings, as noted above, will continue to be prosecuted by the Plan Trustee. The Plan Trustee shall be responsible for reviewing claims filed by creditors and prosecuting objections to the same, where necessary.
>
> Additionally, the Plan Trustee may file additional avoidance actions. The Plan provides that all actions to avoid liens on the vehicles shall be filed no later than 120 days after the Effective Date. The Plan Trustee shall file all other avoidance actions within the time allotted by statute. The Plan Trustee will also continue investigating the causes of the bankruptcy. If the Plan Trustee determines that the estate has claims against creditors or third parties, the Plan Trustee shall pursue such claims on behalf of the Liquidation Trust. The Confirmation Order will include a finding that the Plan Trustee has standing to pursue each and every claim of the estate.
>
> In addition to potential avoidance actions and claim objections, the Plan Trustee shall continue to evaluate potential claims against insiders of the Debtor and potential claims against IBM Southeast Employees Federal Credit Union relating to its involvement in promoting Alliance's operations.

***Third Amended Disclosure Statement in Support of Trustee's Third Amended Plan of Liquidation*** Docket Number 306, page 8 (April 5, 2006). The Plan provides:

### VII. RETENTION OF JURISDICTION

A. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 case after the Effective Date as is legally permissible, including jurisdiction to:

> 1. Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any claim or equity interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of claims or equity interests, including subordination of claims;
>
> 2. Adjudicate any claims by the Debtor or Plan Trustee against third-parties;

> 3. Grant or deny applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;
>
> 4. Enter such orders necessary to carry out the provisions of the Plan;
>
> 5. Resolving any disputes as to the distributions to be made under the Plan;
>
> 6. Determine and resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any otherdocument created in connection with the Plan, the Disclosure Statement, or the Confirmation Order; and
>
> 7. Enter a final decree concluding the Chapter 11 case.
>
> B. The Plan contemplates significant post-confirmation litigation and, consequently, retention of jurisdiction by the Bankruptcy Court is an essential component of the Plan.
>
> ### *VIII. MISCELLANEOUS PROVISIONS*
> . . .
>
> D. Retention of Causes of Action – All rights and causes of action held by the Debtor or the Trustee prior to confirmation shall be transferred to the Plan Trustee, as successor in interest, regardless of whether such rights or causes of action came into being pre-petition or post-petition.

***Trustee's Third Amended Chapter 11 Plan of Liquidation***, Docket Number 305, pages 15-16 (April 5, 2006).

Based on these provisions, it is clear to the court that any interested party participating in the confirmation process was aware of the trustee's potential claims against these defendants. A hyper-technical and tunneled interpretation of the Plan and Confirmation Order is the only way to achieve the outcome urged by the defendants. However, a plain meaning interpretation of the Disclosure Statement, Plan and Order confirming the Plan, leads to the conclusion that the trustee adequately preserved the causes of actions he alleges in the present adversary proceeding. Accordingly, the court DENIES the defendants' motion to dismiss based upon ***res judicata***.

### B.      *Standing/Lack of Subject Matter Jurisdiction*

In addition to ***res judicata***, Defendants argue that the trustee lacks standing to pursue certain counts in the Amended Complaint. According to the defendants, in Counts I, II, III, and VI the Trustee asserts a claim against IBMSEFCU and/or SSO based on an alleged duty owed to certain "Florida Credit Unions." The estate only owns claims belonging to the Debtor. ***See***, 11 U.S.C. § 541. Consequently, the estate (or the liquidating trust) is precluded from asserting damages based on a breach of duty supposedly owed to third parties.

The trustee responds that the Counts I, II, and III all deal with breach of contract and negligence, and each of the counts pleads with sufficient facts and notice to withstand a motion to dismiss. Count VI alleges intentional representation by SSO. All counts contain factual allegations that SSO or IBMSEFCU breached a duty or a contract "as to Alliance" in addition to the "Florida Credit Unions," according to the trustee.

Rule 12(b)(1) provides for dismissal for lack of subject matter jurisdiction. In addressing a motion to dismiss under Rule 12(b)(1), the court must accept as true all well-pleaded facts set forth in the complaint, and must construe them in the light most favorable to the non-moving party. ***In re Dublin Securities, Inc***. 197 B.R. 66, 69 (S.D.Ohio1996). Dismissal for lack of standing is proper under Rule 12(b)(1) or 12(b)(6). ***Id.***

On Counts I, II, III, and VI the court must accept as true the allegations alleged by the trustee that SSO and IBMSEFCU either breached a contract or a duty of care owed "to Alliance" by failing to manage the Tax Accounts, and failing to inform of Alliance's financial difficulties. The court must accept as true that SSO's intentional misrepresentations caused damage "to Alliance." At this time, therefore, the court must

DENY the defendants' motion to dismiss based upon lack of standing or lack of subject matter jurisdiction. The denial is without prejudice.

### C. *Motion to Dismiss for Failure to State Claim 12(b)(6)*

Defendants also seek dismissal of Counts IV and V for failure to state a claim for which relief can be granted pursuant to Fed.R.Bankr. P 7012(b)(6). Count IV of the Amended Complaint seeks Contribution from SSO as a joint venturer. Count V seeks equitable subordination of IBMSEFCU's claim. The trustee argues that both counts withstand the liberal notice pleading standards under the Federal Rules of Civil Procedure.

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." **Conley v. Gibson**, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the non-movant. **Scheuer v. Rhodes**, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); **Mayer v. Mylod,** 988 F.2d 635, 637 (6th Cir.1993). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, **Lawler v. Marshall,** 898 F.2d 1196, 1199 (6th Cir.1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." **Morgan v. Church's Fried Chicken**, 829 F.2d 10, 12 (6th Cir.1987). Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claims made, if the facts alleged are insufficient to state a claim, or if there is an insurmountable bar on the face of the complaint. A Rule 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. **Haffey v. Taft**, 803 F.Supp. 121, 127 (S.D.Ohio 1992).

Count IV alleges as follows:

46. SSO and Alliance were joint venturers with respect to the Alliance Automotive Program. Over the course of the joint venture arrangement, SSO received over $1 million in revenue from the Alliance Automotive Program.

47. As a joint venturer with Alliance, SSO and Alliance are jointly and severally liable to the Florida credit unions, credit union members, and vehicle dealers who have claims relating their participation in the Alliance Automotive Program. All assets of Alliance have been liquidated and will be distributed pursuant to the provisions of the Bankruptcy Code. Alliance is entitled to contribution from the SSO for the remaining amounts necessary to make the creditors of the Alliance Automotive Program whole.

48. Alliance seeks contribution equal to the total of the outstanding claims in the Alliance bankruptcy case, less the anticipated distribution on those claims from current estate assets. The Trustee asserts that the contribution award should be no less than $2,300,200.

SSO relies upon the Service Agreement between SSO and Alliance that provides:

SOUTHEAST SERVICES shall perform the aforementioned services to the extent permitted by applicable law. However, the provision of such services, including, but not limited to the receipt or forwarding materials or funds related to the Automotive Program, nor any provision herein, shall be construed as creating a relationship of partners, joint venturers, masterservant, or agent-principal, for any purpose whatsoever between SOUTHEAST SERVICES and ALLIANCE. ALLIANCE agrees to specifically defend SOUTHEAST SERVICES against any claim or cause based upon an allegation that such relationship exists.

Even taking all of the trustee's allegations as true in Count IV, the inescapable conclusion, based on the parties own agreement, is there is no law to support the claims made; the facts alleged are insufficient to state a claim; and, the contract is an insurmountable bar to Count IV.

Count IV relies upon SSO as a joint venturer, and the parties own agreement denies that relationship. The court hereby GRANTS SSO's Motion to Dismiss Count IV of the Complaint.

Count V seeks to equitably subordinate SSO's claim. The exact allegations of

Count V are as follows:

> 50. SSO holds a contingent claim against the bankruptcy estate relating to the SSO Agreement.
>
> 51. SSO engaged in inequitable conduct by advising IBMSEFCU of Alliance's impending financial problems but not providing that information to all of the Florida credit unions. For approximately one and one-half years, IBMSEFCU benefited from the information it obtained from SSO because, and by ceasing ongoing leasing business with Alliance, IBMSEFCU's exposure decreased relative to other Florida credit unions.
>
> 52. SSO's conduct was inequitable and allowed SSO's related credit union, IBMSEFCU, to benefit at the expense of the other Florida credit unions. Furthermore, subordination of SSO's claim is fully consistent with the provisions and goals of the Bankruptcy Code.
>
> 53. Therefore, pursuant to 11 U.S.C. § 510, SSO's claims, if any, against Alliance or the Estate should be equitably subordinated to the claims of all other creditors in this case.

The trustee seeks to subordinate SSO's claim "if any," to all claims of other creditors in this case. SSO has not filed a proof of claim in the bankruptcy and at this time has no claim to equitably subordinate. There is no stated cause of action in Count V at this time. Even the trustee admitted during argument that this Count is easily "resurrected" as an affirmative defense to any claim sought by SSO.

The court, therefore, GRANTS SSO's Motion to Dismiss Count V of the trustee's Amended Complaint for failure to state a claim for which relief can be granted.

## *II. Abstention*

After dismissal of counts IV and V of the Amended Complaint, the trustee is left with the following counts:

Count I: Breach of Contract action against SSO
Count II: Negligence claim against IBMSEFCU
Count III: Negligence claim against SSO
Count VI: Intentional Misrepresentation Claim against SSO
Count VII: Conversion by SSO

Count VIII: Breach of Contract by IBMSEFCU.
Count IX: Equitable subordination of IBMSEFCU's claim
Count X: Breach of contract against SSO

Alliance Leasing and SSO entered into a "Service Agreement" that contains the following provision regarding choice of law and arbitration:

> GOVERNING LAW. This Agreement shall be construed and enforced in accordance with the laws of the State of Florida. Litigation shall be in the 15th Judicial Circuit Court of Florida, located in Palm Beach County, and venue shall be exclusively in Palm Beach County, Florida.
>
> ARBITRATION. The parties agree that it is expressly a condition precedent to the commencement of court proceedings of any nature that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall first be submitted to arbitration. Arbitration shall be conducted in accordance with the Rules of the American Arbitration Association.

Defendants argue that the court should mandatorily abstain or request that the court permissively abstain based upon the choice of law provision in the contracts, the arbitration provision in the contract, and upon on the non-core nature of all counts except the equitable subordination court against IBMSEFCU. Absent the equitable subordination claim, the defendants point out that if the Debtor had never commenced a bankruptcy case, the very same lawsuit could have been filed in a Florida state court (or before an arbitration panel, in the case of the SSO Agreement).

The trustee argues that the Plan committed these defendants to have these matters heard in the bankruptcy court by the extensive retention of jurisdiction provisions in the confirmed chapter 11 plan. Furthermore, the trustee contends that the matters are core matters, and any arbitration provisions were waived by the defendants' participation in the bankruptcy proceedings.

### A. Mandatory Abstention

Depending upon the legal and factual circumstances, a bankruptcy court either must abstain from hearing a state-law claim (mandatory abstention), 28 U.S.C. § 1334(c)(2), or may abstain (permissive abstention), 28 U.S.C. § 1334(c)(1). The mandatory abstention provision states as follows:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under [the Bankruptcy Code] but not arising under [the Bankruptcy Code] or arising in a case under [the Bankruptcy Code], with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*Id*. § 1334(c)(2). Interpreting this provision, this court held in ***In re Dow Corning Corp***., 86 F.3d 482, 497 (6th Cir.1996), that

> [f]or mandatory abstention to apply, a proceeding must: (1) be based on a state law claim or cause of action; (2) lack a federal jurisdictional basis absent the bankruptcy; (3) be commenced in a state forum of appropriate jurisdiction; (4) be capable of timely adjudication; and (5) be a non-core proceeding.

***In re Lowenbraun*** 453 F.3d 314, 320 (6th Cir. 2006). Applying the language of section 1334(c)(2) to this matter leads the court to find that mandatory abstention is not required. Although this matter is a "related to" matter that is based upon state law claims and it could not have been commenced in a court of the United States absent jurisdiction under section 1334, a state law action has not previously been commenced in a state forum. If a lawsuit had been commenced in state court prior to the filing of the present suit, then the court may have been required to abstain. That is not the case, however, and the mandatory abstention doctrine does not apply.

### *B. Permissive Abstention*

Section 1334(c)(1), however, allows a court to voluntarily abstain in the "interest of justice" or "the interest of comity with State courts or respect for State law." Voluntary, or permissive, abstention is available in both core and non-core proceedings. ***See In re Underwood***, 299 B.R. 471, 476 (Bankr.S.D.Ohio 2003); ***In re Tremaine***, 188 B.R. 380, 384 (Bankr.S.D.Ohio 1995). Although abstention from the exercise of federal jurisdiction is the exception rather than the rule, ***see Underwood***, 299 B.R. at 476, the decision to do so is "in the sound discretion of the bankruptcy judge and can be raised sua sponte as long as the parties have an opportunity to be heard." ***Id.*** When deciding whether to voluntarily abstain, courts have used an non-exclusive list of factors. Those factors, and the applicability of the same in this case, follow:

(1)   the effect or lack of effect on the efficient administration of the estate if the court abstains; (In this case, little effect)

(2)   the extent to which state law issues predominate over bankruptcy issues; (Almost exclusively Florida state law issues exist in this case.)

(3)   the difficulty or unsettled nature of the applicable state law; (The actions raised appear to be garden variety tort and contract issues dealt with in the state courts on a daily basis.)

(4)   the presence of a related proceeding commenced in state court or other non-bankruptcy court; (There is no pending proceeding.)

(5)   the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (Outside of the equitable subordination claim against IBMSEFCU, there is no independent jurisdictional basis.)

(6)   the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (Although a recovery would provide a distribution, this is exactly the type of case ***Marathon Pipeline*** determined to be non-core.).

(7)   the substance rather than the form of an asserted "core" proceeding; (This is not a factor in this case.)

(8)   the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (All claims relate to the same basic set of facts, including the core equitable subordination claim thrown in with the non-core claims in this case. While the court does not suggest that this amounts to forum shopping by the trustee, it does note that the equitable subordination claim against IBMSEFCU has other "lives" than among the state law contract and tort issues.)

(9) the burden of this court's docket; (This is not a factor in this case.)

(10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (This is not a factor in this case.)

(11) the existence of a right to a jury trial; (This is not an issue raised in this case.)

(12) the presence in the proceeding of nondebtor parties; and (This is not a factor in this case.)

(13) any unusual or other significant factors. (None).

*Id*.; *see also Tremaine*, 188 B.R. at 384-85; ***Nationwide Roofing & Sheet Metal v. Cincinnati Ins. Co. (In re Nationwide Roofing & Sheet Metal, Inc.)***, 130 B.R. 768, 780 (Bankr. S.D.Ohio 1991); ***In re Refrigerant Reclamation Corp. of America***, 186 B.R. 78, 84 (Bankr. M.D. Tenn. 1995). As noted, these factors are not exclusive and the decision to voluntarily abstain is ultimately one that should be balanced using a court's equitable discretion. ***See Underwood***, 299 B.R. at 476. ***In re Dayton Title Agency, Inc.,*** 304 B.R. 323 (Bankr. S.D. Ohio 2004).

The trustee's actions are, in essence, tort and contract collection actions brought by the estate against third parties, and are non-core.[1] ***See In re Arter & Hadden, LLP,*** 339 B.R. 445 (Bankr. N.D. Ohio 2006) (chapter 7 trustee's action for prepetition breach of contract is non-core*)*; ***In re Durango Georgia Paper Co.***, 309 B.R. 394, 399 (Bankr.S.D.Ga.2004) (citing ***Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*** 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)) ("It seems well settled that an adversary complaint to recover a prepetition account receivable where the

---

[1] The trustee's claim for equitable subordination against IBMSEFCU is the sole exception to the non-core nature of all of the other proceedings. Equitable subordination can be "resurrected," to use the trustee's term, in the context of an affirmative defense to IBMSEFCU's claim. The court has discretion, even on core matters, as to whether to abstain. In this case, the court finds abstention, even as to this core Count in the otherwise non-core complaint, is appropriate.

17-U.S. Bankruptcy Court, M.D. Tenn.

defendant did not file a proof of claim is not a core proceeding."); ***In re Coho Energy, Inc.***, 309 B.R. 217, 222 (Bankr.N.D.Tex.2004) ("This is an action seeking damages for pre-petition breaches of pre-petition contracts and for pre-petition tortious conduct, and it is a non-core proceeding which neither arises in nor under title 11."); ***In re DVI, Inc***., 305 B.R. 414, 416 (Bankr.D.Del.2004) ("[A] proceeding to collect accounts receivable in which the underlying transaction occurred pre-petition is only 'related to a case under title 11' and is therefore, non-core."); ***In re Hughes-Bechtol, Inc.***, 132 B.R. 339, 345 (Bankr.S.D.Ohio 1991) (quoting ***Matter of Commercial Heat Treating of Dayton, Inc***., 80 B.R. at 890) ("a proceeding to collect a prepetition account receivable that is subject to a BONAFIDE dispute is a non-core proceeding."); ***In re United Sec. & Communications, Inc***., 93 B.R. at 957 ("The clear majority, and better-reasoned, view is that state law, contract-type actions, such as the lawsuit before the Court here, which literally fall within the broad catchall language of 28 U.S.C. § 157(b)(2)(A) and (O), are noncore, 'related' proceedings.").

The trustee is seeking damages for the alleged breach of contract, negligence, intentional misrepresentation and conversion by SSO and IBMSEFCU. All of these allegations are based upon Florida state law. All of these action exist absolutely independent of the bankruptcy case of Alliance. The effect upon the administration of the estate is, in all actuality, unaffected. The trustee's plan of liquidation advised interested parties of the existence of potential litigation to finalize exactly what assets would be available for distribution to creditors. Whether these purely state law collection actions proceed in Florida has absolutely no effect on the administration of the debtor's bankruptcy estate.

As to the timeliness of adjudication in the state law forum, the parties' relationships seems to require arbitration. The Service Agreement contemplates that

"any controversy or claim arising out of or relating to [the Agreement], or the breach thereof, shall first be submitted to arbitration. The trustee's arguments relating to the binding effect of confirmation and waiver are simply not persuasive.

The trustee seems to imply that the confirmation order bound the defendants to have *any* dispute heard by the bankruptcy court. The Confirmed Plan states that the court will retain jurisdiction over the chapter 11 case "as is legally permissible" including jurisdiction to resolve disputes against third parties. The court is by no means "required" to exercise jurisdiction, and to the extent "legally permissible" language acknowledges that some matters, such as non-core matters, may not be best decided in the bankruptcy forum.

The court also rejects the trustee's waiver argument. The trustee contends that the defendants waived any right to assert arbitration based on their participation in the bankruptcy proceedings and their failure to appeal the confirmation order retaining jurisdiction. To take the trustee's argument to its extreme, if the arbitration provision is a condition precedent to "any" court proceeding, then arbitration was required prior to Alliance filing bankruptcy. In this case, it is clear that the arbitration provision was designed to address exactly the issues now being pursued by the trustee. Accordingly, the court finds no waiver exists by the defendants as to the arbitration provisions in the SSO.

Based upon consideration of all of the above, the court finds the defendants' motion for abstention well taken. The court hereby GRANTS the defendants' motion and will abstain as to the following Counts in the Trustee's Amended Complaint:

    Count I:     Breach of Contract action against SSO
    Count II:    Negligence claim against IBMSEFCU
    Count III:   Negligence claim against SSO

Case 3:07-ap-00065   Doc 31   Filed 07/03/07   Entered 07/03/07 17:38:10   Desc Main
Document      Page 19 of 20

Count VI:     Intentional Misrepresentation Claim against SSO
Count VII:    Conversion by SSO
Count VIII:   Breach of Contract by IBMSEFCU.
Count IX:     Equitable Subordination against IBMSEFCU
Count X:      Breach of contract against SSO.[2]

In summary, the court GRANTS the defendants' Motion to Dismiss Counts IV and V of the Trustee's Amended Complaint. The Court DENIES the defendants' Motion to Dismiss in all other respects. The court GRANTS the defendants' Motion for Abstention and therefore abstains on Counts I, II, III, VI, VII, VIII, IX, and X. The court will instruct defendants' counsels to prepare an order not inconsistent with this decision and submit the Order to the court within ten (10) days of entry of this Memorandum.

It is, THEREFORE, so ordered.

This ____ day of July, 2007.

***THIS MEMORANDUM WAS SIGNED AND
ENTERED ELECTRONICALLY AS INDICATED
AT THE TOP OF THE FIRST PAGE.***

---

[2] The court has previously disposed of the following counts:

Count IV:     Contribution against SSO (DISMISSED)

Count V:      Equitable Subordination against SSO (DISMISSED)

20-U.S. Bankruptcy Court, M.D. Tenn.